UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONSTANCE COLAIANNI,

                Plaintiff,                No. 05-CV-70254-DT

vs.                                      Hon. Gerald E. Rosen

DAIMLER CHRYSLER EXTENDED
DISABILITY BENEFITS PROGRAM,

                Defendant.
_____/

OPINION AND ORDER GRANTING DEFENDANT'S MOTION
FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND
DENYING PLAINTIFF'S MOTION TO REVERSE THE ERISA
DETERMINATION AND GRANT LONG-TERM DISABILITY BENEFITS

                At a session of said Court, held in
                the U.S. Courthouse, Detroit, Michigan
                on September 28, 2006

                PRESENT:  Honorable Gerald E. Rosen
                                    United States District Judge

## I. INTRODUCTION

     This ERISA denial of benefits action is before the Court on the Cross-Motions of Defendant DaimlerChrysler Extended Disability Benefits Program (the "Plan") and Plaintiff Constance Colaianni, respectively requesting affirmance and reversal of the ERISA plan administrator's decision terminating Ms. Colaianni's extended disability benefit payments. Having reviewed Plaintiff's and Defendant's briefs and the

1

Administrative Record in this matter, the Court has determined that oral argument is not necessary. Therefore, pursuant to Local Rule 7.1(e)(2), this matter will be decided on the briefs. This Opinion and Order sets forth the Court's ruling.

## II. PERTINENT FACTS

Plaintiff Constance Colaianni is a former DaimlerChrysler salaried bargaining unit employee. Ms. Colaianni was hired by DaimlerChrysler in February 1997 and, as of May 1998, was employed as a Customer Service Representative at the Customer Call Center at DaimlerChrysler's Hamlin Road facility in Auburn Hills, Michigan. Ms. Colaianni's job duties primarily involved telephone work speaking with car owners and dealers around the country. Much of the work involved handling complaints.

On April 9, 2001, Plaintiff took a leave of absence for health reasons, namely stress and depression. She also complained of fatigue and "being run down." She began collecting Sick and Accident ("S & A") Benefits under DaimlerChrysler's S & A Benefit Plan and continued to do so for the maximum allowable period of time -- 52 weeks. While Plaintiff was collecting S & A benefits, on April 24, 2001, she had an Independent Psychiatric Examination conducted by psychiatrist Dr. Elliott Wolf. Dr. Wolf ultimately determined that Ms. Colaianni did not have a disabling psychiatric condition. He did note, however, that Plaintiff "appear[ed] to have a slight to moderate depression which appear[ed] to be the result rather than the cause of a long list of physical symptoms." [*See*

2

AR pp.2-5.]¹  While, the doctor noted that "Ms. Colaianni may have a disabling *medical* condition," she did not have a disabling *psychiatric* condition.  *Id.* at p. 5 (emphasis added).  Accordingly, Dr. Wolf found her, as of April 24, 2001, "psychiatrically able to return to work." *Id.*  Nonetheless, because of the possibility of a disabling medical condition beyond the purview of his examination of Plaintiff, Dr. Wolf recommended that she be sent for an Independent *Medical* Examination.  *Id.*

On April 9, 2002, after her S & A benefits expired, as recommended by Dr. Wolf, Plaintiff was sent for an Independent Medical Examination by Dr. Nicholas Lekas, a specialist in Infectious Diseases and Internal Medicine.  Dr. Lekas found Plaintiff unable to work due to chronic fatigue syndrome, possibly due to a chronic Epstein-Barr virus infection; superimposed depression; and a possible sleep disorder. [AR pp. 6-11.] Dr. Lekas opined:

> The patient is currently seeing Dr. Martin Lerner who is treating her with antiviral medications for what we presume to be a chronic Epstein-Barr. This treatment is controversial and I personally do not recommend it in these cases.  However, Dr. Lerner has considerable experience and has been treating a number of patients with this approach.  I am concerned that the patient may have a sleep disorder and that this should be ruled out. Sometimes sleep disorders can be mistaken for depression and it would be worthwhile to have her evaluated.  I also believe that she has true depression and needs ongoing treatment, both psychotherapy as well as pharmacologic therapy.
>
> The duration of this treatment is unclear in my mind.  It may be that the patient may be ill for another six to nine months before she starts to recover. I do not believe that the patient can currently work at even a desk-type job

---

¹ Citations to pertinent pages of the Administrative Record in this matter are noted as "AR p. ___."

> in the customer service department in view of her limited exercise tolerance and her chronic fatigue, not to mention the obvious depression that she demonstrates.

*Id.* at pp. 10-11.

Based on Dr. Lekas's opinion and the fact that Plaintiff had exhausted her S & A benefits, Plaintiff was found eligible for, and began receiving Extended Disability Benefits ("EDB") as of April 12, 2002. She was originally authorized for two months EDB. *See* AR p. 24.

DaimlerChrysler's Extended Disability Benefits Plan

The Extended Disability Benefits program is DaimlerChrysler's long-term disability benefits program for salaried collective bargaining unit employees.[2] It is part of DaimlerChrysler's "Life, Disability and Health Care Benefits Program," and is incorporated in the National Collective Bargaining Agreement between DaimlerChrysler and the UAW. [*See* Defendant's Ex. B.] The Program is administered by a Third-Party Claims Administrator, ESIS.[3]

Section 8 of the plan sets forth the eligibility requirements for Extended Disability Benefits and provides, in relevant part, as follows:

---

[2] A separate "Long-Term Disability Plan" covers salaried non-union employees.

[3] DaimlerChrysler (the "Corporation") is the Administrator and Fiduciary named in the Plan documents. However, the Plan also gives the Corporation the authority to delegate its administrative responsibilities and, pursuant to this delegation of authority, ESIS administers the EDB program. *See* Defendant's Ex. B, § 7(A).

A.   Eligibility

An employee who is insured for the sickness and accident benefits provided in Section 6 hereof or the reinstated sickness and accident benefits provided in Section 7 hereof, and who at the date of expiration of the maximum number of weeks for which he is entitled to receive sickness and accident benefits or reinstated sickness and accident benefits and during a continuous period of disability thereafter, is totally disabled so as to be prevented thereby from engaging in regular employment or occupation with the Corporation at the plant or plant where he has seniority for remuneration or profit, shall receive monthly extended disability benefits. . . .

[Defendant's Ex. B.]

The Summary Plan Description ("SDP") provides:

**Eligibility**

To be eligible for EDP you must:

- Be covered for S&A benefits or reinstated S&A benefits;

- Have exhausted the maximum number of weeks for which you are entitled to receive S&A or reinstated S&A during a period of disability;

- Be under the continuous care of a physician who certifies your total disability;

- Be totally disabled because of disease or injury so as to be prevented thereby from engaging in regular employment or occupation with the Corporation at the plant or plants where you have seniority, whether or not it is available; and

- Have applied for this benefit **and furnished satisfactory proof of disability**.

[Defendant's Ex. C (emphasis added).]

Plaintiff was required periodically to substantiate her continued need for EDB and prove that she remained totally disabled. [*See* Ex. B, § L (the EDB applicant "may [be]

5

require[d], as condition of eligibility, to submit to examinations by a physician designated by [the administrator] for the purpose of determining his initial or continuing disability.") Accordingly, after receiving EDB for two months, Plaintiff was sent for another Independent Psychiatric Examination in June 2002 which was conducted by psychiatrist Dr. Edward Klarman.  Dr. Klarman found no evidence of mental illness, however, he noted Ms. Colaianni's continued complaints of chronic fatigue syndrome.  *Id.* at p. 35.  However, from a psychiatric point of view, Dr. Klarman concluded that Plaintiff was "fully capable of undertaking employment" and had "no psychiatric disability or restriction." [AR pp. 25-36.] With regard to Plaintiff's physical complaints, Dr. Klarman stated, "I defer to the physicians who have examined her physically -- namely her chronic fatigue syndrome -- to make [an] appropriate appraisal as to the limitations that apply." *Id.*

Thereafter, Plaintiff's EDB benefits were discontinued and she returned to work sporadically from June through the end of July 2002 working at most four hours at a time. In early August 2002, her EDB claim was reopened.  *See* AR pp. 38-44.[4]

---

[4] Section 8(G) of the Plan provides:

> If an employee returns to work with the Corporation and again becomes disabled by the same or a related cause within three (3) months, the EDB claim is reopened and benefits are paid at the same rate as were paid prior to the return to work or if he engages in regular occupation or employment for remuneration or profit, his satisfying of the disability requirement shall not be deemed to end, but his extended disability benefits shall be suspended for the period of the ineffective return to work or the period he engages in such occupation or employment.

6

On August 2, 2002, Dr. Jeff Parker, a specialist in Internal and Pulmonary Medicine conducted another Independent Medical Examination of Plaintiff. Again, Plaintiff presented with "fatigue" as her primary complaint. [AR pp. 45-46.] Although he noted Plaintiff's history of "chronic fatigue syndrome with psychiatric overlay," Dr. Parker found "no objective evidence of a disease," and concluded that Ms. Colaianni was "able to return to work without restrictions as of today's date, i.e., 08/02/02," suggesting, however, that Plaintiff "should continue with psychotherapy on an outpatient basis." *Id.* at 46.

Shortly thereafter, on August 27, 2002, Plaintiff underwent a second Independent Medical Examination with Dr. Nicholas Lekas who had previously evaluated Plaintiff in April 2002 and declared her totally disabled due to chronic fatigue at that time. In his report of his August 27 examination of Plaintiff, Dr. Lekas noted that Ms. Colaianni was "resolving [her] chronic fatigue syndrome" and that her "depression [was] now improved." [AR pp. 48-51.] However, although Dr. Lekas concluded that Plaintiff was "obviously making progress in the right direction," he stated that he "could not certify that she could return to work at the present time," but anticipated that she would "be able to return to work within a couple of months, probably six to eight weeks" on a part-time and possible full-time basis. *Id.* at 50-51. Accordingly, her Extended Disability Benefits were continued.

On February 21, 2003, Plaintiff returned to work for one day and was thereafter

---

[Defendant's Ex. B, § 8(G).]

scheduled for an Independent Medical Examination with Dr. Vijaya Thandra.  Dr. Thandra examined Plaintiff on March 5, 2003.  According to Dr. Thandra's report, Plaintiff told the doctor that "she ha[d] been having frequent upper and lower respiratory infections and chronic fatigue syndrome over the last five months." [*See* AR p. 57-58.] After examining Plaintiff, Dr. Thandra concluded:

> After talking to the patient and examination, she does appear to have possible fibromyalgia and possible depression, too.  She can probably work and is eager to go back to work, but she probably needs to be on restrictions as far as exposure to chemicals or dust. . . .

*Id.* at p. 58

Based on Dr. Thandra's opinion that Plaintiff could work, Defendant directed her to report for work on March 19, 2003 and terminated her EDB.  Plaintiff worked only until April 7, 2003 and was off sick again until July 2003. [AR pp. 59-60.]

On April 24, 2003, Plaintiff sought treatment with Dr. Richard Shoemaker, a chronic fatigue specialist in Pocomoke, Maryland.  After examining Plaintiff, Dr. Shoemaker concluded that Plaintiff was able to return to work with restrictions. [AR p. 93.]  He subsequently cleared her to return to work without restrictions on July 7, 2003. *Id.* p. 104.  By this time, Plaintiff reported "dramatic improvement" in her symptoms since her treatment with Dr. Shoemaker in April 2003.  However, Plaintiff worked only one day in July 2003, following which, on July 10, 2003, Dr. Shoemaker sent Plaintiff a two-sentence recommendation that she stay off work for 10 days, allegedly based on the results of his "diagnostic" study.  He also "barred" Plaintiff from working in her current

location for "health reasons." [AR p. 92.]⁵ Thereafter, Plaintiff never returned to work again nor did she contact her employer or Defendant with any further medical information until February 2004.

On February 2, 2004, Plaintiff, through counsel, appealed the termination of her Extended Disability Benefits and with her appeal submitted medical records from Dr. Shoemaker. [*See* AR pp. 72-140.] Then, on May 11, 2004, Plaintiff's counsel sent to Defendant a copy of a report from Dr. Shoemaker prepared January 31, 2004 which was addressed to another attorney, Dodd Fisher of Grosse Pointe, Michigan. [*See* AR pp. 141-156.] Although not entirely clear, it appears that this report was prepared by Dr. Shoemaker in support of a workers' compensation claim Fisher had filed, or was filing, on behalf of Ms. Colaianni.  In this report, Dr. Shoemaker opines that Plaintiff was suffering from "Sick Building Syndrome."  Dr. Shoemaker reached this conclusion, however, without having conducted any independent testing of Plaintiff's work place. Instead, Dr. Shoemaker based this opinion entirely upon a similarity in some of the symptoms exhibited by Plaintiff to a group of patients he claims to have studied from the

---

⁵ It is undisputed that April 23, 2003 was the only time that Dr. Shoemaker examined Plaintiff.  As noted, Dr. Shoemaker's "Chronic Fatigue Center" is located in the State of Maryland, while Plaintiff resides in the Detroit area.  On two occasions -- once before, and once after her one-time examination by Dr. Shoemaker -- i.e., on March 28 and August 7, 2003, Plaintiff provided Dr. Shoemaker with a list of her symptoms in writing, pursuant to which he would then evaluate her condition in lieu of personally examining her. [*See* AR pp. 105-107, 82.] Plaintiff also completed and sent Dr. Shoemaker completed on-line "Questionnaires" about her symptoms. [AR pp. 83, 95-100.] It is apparently based upon the information sent by Plaintiff to Dr. Shoemaker that he made the two-sentence recommendation that Plaintiff stay off work for 10 days and not ever return to work at her current location.

9

Baltimore-Washington Conference of the United Methodist Church. Notwithstanding a lengthy discussion of his study, Dr. Shoemaker never concludes that Plaintiff is disabled.

On August 27, 2004, DaimlerChrysler notified Plaintiff that she had not established a satisfactory reason for her absence from work since July 9, 2003 and would have to report for work by September 3, 2004 or risk termination from employment. [*See* Defendant's Ex. D.] Plaintiff did not report to work and, therefore, her employment was terminated effective September 3, 2004.

On March 15, 2005, Plaintiff's appeal of the termination of her Extended Disability Benefits was denied. The denial letter sent by Defendant advised Plaintiff:

> Extended Disability Benefits are provided to employees who are totally disabled because of disease or injury so as to be prevented from engaging in regular employment or occupation with the Corporation and who satisfy the terms of the Plan. Based on the information provided to us you do not meet the requirements set forth in the Plan because of the reason(s) below (Article references to specific Plan document provisions appear in parenthesis [sic; parentheses] below.)
>
>     1.    **You are not totally disabled** because of disease or injury **so as to be unable to engage in regular employment or occupation with the Corporation**:
>
> (a) based on our records including the results of your Disability Evaluation Program (DEP) which is final and binding (UAW Plan, Exhibit B, Letter B-7);
>
> **and you are**:
>
> (a) **able to work** (UAW Plan Exhibit B, Letter B-7); **or**
>
> (b) **able to work with restrictions** (UAW Plan Exhibit B, Letter B-7.)

[AR p. 177 (emphasis added).]

Pursuant to her rights under ERISA, Plaintiff then instituted this action.

## III.  DISCUSSION

A.  STANDARD AND SCOPE OF JUDICIAL REVIEW IN ERISA CASES

The Supreme Court has ruled that the standard of review in ERISA cases is *de novo* unless the benefit plan gives the plan administrator discretion to determine eligibility for benefits or construe plan terms:

> Consistent with established principles of trust law, we hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

*Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956 (1989). *See also, Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 616 (6th Cir. 1998). Alternatively, "where an ERISA plan expressly affords discretion to trustees to make benefit determinations, a court reviewing the plan administrator's actions should apply the arbitrary and capricious standard of review." *Williams v. International Paper Co.,* 227 F.3d 706, 711 (6th Cir. 2000).

In this case, the Plan expressly gives the Program Administrator the discretionary authority to interpret Plan provisions and to determine eligibility for benefits.  Article I, Section 7 of the DaimlerChrysler Life, Disability and Health Care Benefits Program provides:

> The Program Administrator shall have full power and authority to

> administer the Life, Disability and Health Care Benefits Program and to interpret its provisions, including, but not limited to, discretionary authority to determine eligibility for and entitlement to Program benefits, subject only to an arbitrary and capricious standard of review.

[*See* Defendant's Ex. B, Art. I, § 7(B).]

Inasmuch as the standard of review is the arbitrary and capricious standard, this Court's review of the Administrator's decision is based solely upon the administrative record. *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 619 (6th Cir. 1998).

B.  THE PROGRAM ADMINISTRATOR DID NOT ACT ARBITRARILY OR CAPRICIOUSLY IN TERMINATING PLAINTIFF'S EXTENDED DISABILITY BENEFITS

The arbitrary and capricious standard is a highly deferential one. *See Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 520 (6th Cir.1998) (quoting *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir.1996)) ("where, as here, the plan administrator is given the discretionary authority to determine eligibility for benefits or to construe the plan terms, 'we review the administrator's decision to deny benefits using 'the highly deferential arbitrary and capricious standard of review.'") Under the arbitrary and capricious standard, a court will uphold a plan administrator's benefit determination if that determination was rational in light of the plan's provisions. *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1987), *cert. denied*, 488 U.S. 826 (1988). Stated differently, "when it is possible to offer a reasoned explanation, based on evidence for a particular outcome, the outcome is not arbitrary and capricious." *Davis v. Kentucky Finance Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989), *cert. denied*, 495 U.S.

905 (1990) . *See also*, *Marchetti v. Sun Life Assurance Company*, 30 F. Supp. 2d 1001, 1008 (M.D. Tenn. 1998).

Here, the administrative record more than abundantly supports the conclusion that the Program Administrator's decision was both reasonable and "rational in light of the plan's provisions."

The Program Administrator's stated reason for denying Plaintiff's claim for benefits was that her medical records, including the records submitted in connection with her appeal, did not substantiate Plaintiff's claim that she was disabled and unable to work with or without restrictions. In seeking reversal of the Administrator's decision, Plaintiff relies almost exclusively on the records she submitted from Dr. Shoemaker in connection with her administrative appeal.

As indicated above, the Administrative Record indicates that Dr. Shoemaker examined Plaintiff for her alleged disability on April 24, 2003, less than one month after Dr. Thandra opined that Plaintiff was not disabled and could work. Furthermore, even Dr. Shoemaker concluded after examining Plaintiff that she could return to work in July 2003, albeit with restrictions. [*See* AR p. 93.] Then, after Plaintiff returned to work and worked only one day in July, Dr. Shoemaker changed courses and directed Plaintiff not to go back to work.

It was not until five months later, on January 31, 2004, that Dr. Shoemaker prepared a report of his examination of Plaintiff. As noted, the bulk of that report is a summary of the various tests Dr. Shoemaker allegedly performed on numerous other

patients, not specific to Plaintiff, during a study that Dr. Shoemaker conducted concerning patients from the Baltimore-Washington Conference of the United Methodist Church.

By comparing the symptoms of the patients in the Methodist Church study to the 31 alleged symptoms Plaintiff claimed to suffer, Dr. Shoemaker attributed Plaintiff's symptoms to "Sick Building Syndrome" from exposure to the indoor air environment at Plaintiff's place of employment at DaimlerChrysler's Hamlin Road facility. However, Dr. Shoemaker never visited the Hamlin Road facility and never did any testing of the indoor air environment at that facility. He simply concluded that because Plaintiff reported that her symptoms decreased or disappeared when she was not in the allegedly toxic Hamlin Road building, the building must be toxic. Notwithstanding the lack of any objective scientific evidence to support Dr. Shoemaker's conclusion, even accepting it as true, given that the doctor acknowledged that Plaintiff's symptoms decreased or disappeared when she was not in at the Hamlin Road facility, there is nothing in the doctor's report that suggests that Plaintiff is "totally disabled" from *all* regular employment within the DaimlerChrysler Corporation.

Plaintiff contends that the Administrator acted arbitrarily and capriciously in rejecting the opinion of Dr. Shoemaker and claims that the Administrator should have accepted his opinion since he was her "treating physician." Defendant's position is that Dr. Shoemaker was not Plaintiff's treating physician, and even if he were to be considered her treating physician, Defendant was not obligated to defer to his opinions or

findings of alleged disability. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003).[6] The Court agrees.

First, as noted above, April 23, 2004 was the only time that Dr. Shoemaker examined Plaintiff. As indicated, Dr. Shoemaker's office is in the State of Maryland and Plaintiff resides in the State of Michigan. On two occasions, once before, and once after her one-time examination by Dr. Shoemaker, Plaintiff provided the doctor with a laundry list of her symptoms in writing, pursuant to which Dr. Shoemaker would then presumably "evaluate" her condition in lieu of personally examining her. This occurred on March 28 and August 7, 2003. Plaintiff also completed and sent Dr. Shoemaker "Questionnaires" about her symptoms, which were clearly subjective in context and response. These facts undermine Plaintiff's claim that Dr. Shoemaker was her "treating physician" and further suggests that his opinions are not based on substantial, objective or credible evidence.

It is further undisputed that Plaintiff has not continuously treated with Dr. Shoemaker or any other physician for her alleged disability, as required by the EDB Program. And, the record makes clear that neither Dr. Shoemaker nor any other physician found or certified Plaintiff as totally disabled "because of disease or injury so as to be prevented thereby from engaging in regular employment or occupation with the Corporation," also as required by the EDB Program.

---

[6] Plaintiff urges the Court to issue a ruling that the Supreme Court's decision in *Nord* is "overbroad and contrary to legislative intent" to the extent that it rejects the "treating physician rule" in ERISA cases. Of course, it is axiomatic that as a district court, this Court is without authority to disregard or overrule a Supreme Court decision.

Notwithstanding Dr. Shoemaker's opinion that Plaintiff had "31 symptoms" and an admittedly "controversial" diagnosis of Sick Building Syndrome, these symptoms and diagnosis do not prove that Plaintiff is totally disabled from employment with DaimlerChrysler.  As numerous courts have held, an administrator's decision to deny benefits is reasonable and rational in the absence of objective medical evidence to substantiate the claim of disability.  *See, e.g. Dutton v. UNUM Provident Corp.*, 170 F.Supp.2d 754 (W.D. Mich. 2001) (administrator's decision to deny benefits rational where no evidence or objective data supported claim of disability based on diagnosis); *Renfro v. UNUM Life Ins. Co.*, 920 F. Supp. 831, 839 (E.D. Tenn. 1996) (list of diagnosed conditions, standing alone, does not satisfy burden of proving disability); *Davis v. Broadspire Services, Inc.*, 2006 WL 752602 (E.D. Mich. 2006) (where none of the doctors who treated plaintiff provided any objective medical evidence to substantiate their disability diagnosis plan administrator's denial of disability benefits was rational); *McClanahan v. The Hartford Life and Acc. Ins. Co.*, 2000 WL 1923503 (E.D. Mich. 2000) (defendant's denial of plaintiff's benefits was reasonable and rational in the absence of independent, objective diagnostic tests to corroborate the diagnosis of chronic fatigue syndrome).  Notwithstanding the fact that Dr. Shoemaker has never certified Plaintiff as being totally disabled, even if he had so declared, Dr. Shoemaker has provided no objective evidence whatsoever to substantiate his "Sick Building Syndrome" diagnosis of Plaintiff.

For all of the foregoing reasons, the Court finds that the Plan Administrator did not

act arbitrarily or capriciously in its consideration of, and its ultimate decision terminating Plaintiff's Extended Disability Benefits. To the contrary, the Administrator's decision was both reasonable and rational in light of the Plan provisions.

## CONCLUSION

For all of the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendants' Motion for Judgment on the Administrative Record is GRANTED and Plaintiff's Motion to reverse the Administrator's decision is DENIED.


          s/Gerald E. Rosen
          Gerald E. Rosen
          United States District Judge


Dated: September 28, 2006


I hereby certify that a copy of the foregoing document was served upon counsel of record on September 28, 2006, by electronic and/or ordinary mail.

          s/LaShawn R. Saulsberry
          Case Manager